UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROLAND J.  BOURGEOIS,

                     Plaintiff,

                                            Case Number 05-10020-BC
v.                                               Honorable David M. Lawson

LARN STRAWN,

                     Defendant.

_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION *IN LIMINE*

       This matter is before the Court on the defendant's motion for summary judgment.  On

January 24, 2005, the plaintiff filed a complaint alleging that he had been arrested in violation of the

Fourth Amendment and applicable state law when defendant Larn Strawn, along with the other state

law enforcement officials, executed an arrest warrant on another individual wanted for various

livestock crimes.  The plaintiff claims he is entitled to damages under 42 U.S.C. § 1983 and state

law.  The defendant argues that the plaintiff is precluded from litigating the issue of probable cause

because a preliminary hearing was held at which the plaintiff was bound over for trial on a finding

that there was probable cause to believe the plaintiff resisted and obstructed officers.  Alternatively,

the defendant argues there was probable cause to believe that the plaintiff  resisted and obstructed

police officers and he was an accessory after the fact.  The defendant asserts that even if there was

no probable cause, he is shielded by qualified immunity.  The Court heard the parties' arguments

in open court on January 5, 2006.  The Court now finds that the plaintiff is not estopped from

litigating the issue of probable cause, questions of fact preclude a finding that the plaintiff's arrest

was supported by probable cause as a matter of law, and the defendant is not protected by qualified immunity.  Therefore, the motion for summary judgment will be denied.

I.

The complaint filed in this case arises out of the search for and eventual arrest of Daniel Eichhorn, who is not a party to this case.  Eichhorn apparently was under suspicion by the Michigan Department of Natural Resources ("DNR") for crimes against livestock.  Eventually, a warrant was issued for his arrest.  In searching for Eichhorn, defendant Larn Strawn, a conservation officer with the department, received a tip from individuals who stated that Eichhorn was residing, perhaps even hiding out, with the plaintiff, Roland J. Bourgeois.  The defendant with other state officers went to the plaintiff's residence and ended up arresting both the plaintiff and Eichhorn.  After a state magistrate conducted a preliminary examination, the plaintiff spent some seventy-one days in the Clare County, Michigan jail before a state circuit court judge, finding that the lower court erred in determining that there was probable cause to believe that the defendant committed a crime, quashed the criminal information for lack of evidence that the plaintiff had obstructed or resisted officers. The plaintiff claims in this case that the defendant lacked probable cause to arrest him and his arrest was in violation of the Fourth Amendment.  The defendant asserts that there was probable cause and alternatively, his actions were protected by the doctrine of qualified immunity.  The parties have discovered the following facts.

On November 26, 2003, the Isabella County, Michigan prosecutor's office issued a felony complaint and authorized a warrant for the arrest of Eichhorn.  The six-count complaint charged Eichhorn with stealing livestock, maliciously destroying or injuring a white tail deer, being a felon in possession of a firearm,  possessing a gun while committing the first two crimes, and two counts

-2-

of taking deer, bears, and turkeys in violation of the Wildlife Conservation Act.  The search for Eichhorn began two days later.

On November 28, 2003 at approximately 11:45 a.m., defendant Strawn was contacted by a conservation officer named Strong, who advised the defendant that he had stopped Scott McKenzie and his brother for traffic violations.  Officer Strong told Strawn that "he had information where the suspect, DANIEL EICHHORN, was at [sic]."  Pl.'s Resp. Br. Ex. 5, Incident Report (Nov. 28, 2003).  Thereafter, the defendant met with Strong at the scene of the traffic stop, and he asked Scott McKenzie if he had heard from Eichhorn recently, to which McKenizie replied that Eichhorn had contacted their mother several days ago, but she was very upset and did not want to talk to Eichhorn.  Apparently, the McKenzie brothers were also upset with Eichhorn and refused to speak with him.

McKenzie did tell Strawn that he knew where Eichhorn was staying, and he gave the officers directions to a house in Clare County on Gray Lake.  Strawn then contacted his partner,  DNR officer Jeremy Payne, and  Isabella County sheriff deputy Douglas Fall, for help in apprehending Eichhorn.  Fall stated he needed additional assistance, and Isabella County sheriff's deputy Scott Collett volunteered to go along.

The four officers proceeded to the location identified by McKenzie.  They did not know who owned the residence and they did not have a search warrant.  The house, of course, belonged to the plaintiff.  Apparently, the defendant and Payne could identify Eichhorn, but the others could not.

Payne testified at his deposition that the house was small but otherwise unremarkable.  He recalled that he positioned himself so "if you were looking straight at the house I was at the rear left of the house up on a hill" behind a tree.  Pl.'s Resp. Br. Ex. 2, Payne dep. at 24.  He was armed with

his division-issued rifle.  Payne related that from his location, he could hear "exactly" what the other

officers were saying. *Id.* at 27.

Payne held his position for nearly thirty minutes.  Then, he observed the other officers go

around to the rear of the house.  He could not see the back door from his vantage point.

According to deputy Fall, during this time, defendant Strawn and officer Collett moved to

the side of the house, while Fall proceeded to the front door.  Fall testified that the door  "was

covered in plastic [and] had no door knob on it." Pl.'s Resp. Br. Ex. 7, Fall dep. at 32.  He said that

most of the windows were covered in plastic as well.  Fall knocked on the front door and announced

his presence.  At first, Fall did not see any evidence of an occupant, but after five or ten minutes one

of the other officers "shouted to me that they saw the blinds moving, or a curtain moving or

something." *Id.* at 34.

Despite the curtain movement, Fall stated that it "was 20 to 30 minutes before somebody

made contact with me, a person." *Ibid.*  During that entire time, Fall testified that he continued

knocking on the front door.  Eventually, Fall spoke to a young girl who came to the door, although

he was not able to see her entirely because he was looking through the door handle hole.  Fall

testified:

> Q.     What did this voice on the other side of the this opaque sheeting say to you?
> A.     "What do you want", or something along those lines.
> Q.     You of course told her?
> A.     Who I was and why I was there.
> Q.     You had warrants for Daniel Eichhorn.
> A.     Yes.
> . . .
> Q.     You ha[d] communication with this younger female voice inside the house.
>            What's the next thing you see, do, or hear?
> A.     I told her to call her folks; she said they weren't home.  Then minutes later
>            an adult comes to talk to me, a male.

-4-

*Id.* at 37.

The plaintiff testified at his deposition that the child was his daughter, and the child initially thought the plaintiff was not at home, but at her Aunt's home watching the Aunt's children. The child then found her father sleeping. According to the plaintiff, she informed him that the police were there and they were pointing guns at the house.

The plaintiff went to the front door and signaled the police to walk around to the back of the house. He then went to the back door. Fall confirmed that the plaintiff identified himself as Roland Bourgeois, the owner of the home, and asked Fall to meet him at the backdoor. Fall passed that information on to defendant Strawn.

Strawn testified that at that point he went to the front door:

> Q.    Who [sic] did you communicate with, if you can recall?
> A.    Mr. Bourgeois, I believe. At the time, I did not know who it was. He was peeking through a small corner of a window so I could really only see the lower portion of his face.
> . . .
> Q.    Right.
> A.    And he did not open the door. He was leaning over to the corner of this window. Possibly, if I remember right, he had poked his head kind of in the corner and was talking to me.
> Q.    And even if he had opened the door, he would have to have pulled the sheeting off to get in the doorway anyways, right?
> A.    I don't remember sheeting, but yes, if there was sheeting there.
> Q.    The individual that was now talking to you, did he identify himself?
> A.    Not at that time, no.
> . . .
> Q.    Did you believe that to be Mr. Eichhorn?
> A.    At the moment I did, because this gentlemen had facial hair that resembled Mr. Eichhorn's.

*Id.* at 33-34.

The defendant testified that he next asked the individual if Eichhorn was in the house, and Bourgeois replied, "yes." According to defendant Strawn, the plaintiff then

-5-

started talking to me about Mr. Eichhorn's involvement in the case or the indictment for the arrest warrants. He said we had the wrong person, we needed to talk to this other individual that was with him, and I basically told him to send Mr. Eichhorn out. And he said, no, Daniel will talk to one conservation officer, send a conservation officer in. And, again, I said, no, send Daniel Eichhorn out. We're not going to send an officer in. He said, meet me at the back door, or meet us at the back door.

*Id.* at 35. The defendant then went to the back of the house along with deputy Fall. As he began moving toward the back of the house, he "yelled out to Deputy Collett and Officer Payne, . . . 'Eichhorn's coming out the back, he's coming out the back, he's coming out the back', so that we could kind of shift – or all of us could kind of shift our perspective." *Id.* at 36. The defendant drew his hand gun. Defendant Strawn said he knew that officer Payne had his rifle with him as well.

The plaintiff testified that when he opened the back door, Strawn, Fall, and Collett all had trained their weapons on him. He recalled that "all I seen was guns coming in pointing at me, someone trying to grab a hold of me." Bourgeois dep. at 53. As the plaintiff opened the door, the defendant and Fall began yelling, "Daniel Eichhorn, Daniel Eichhorn. Get out of there. Get down on the ground." Strawn dep. at 39. The plaintiff recalled:

> Q. You opened the door and they were trying to grab you?
> A. Yeah, I thought like I was a murderer or something, they just come, tried to grab me, yelling and everything. I didn't know what was going on.
> . . .
> Q. Well how can they reach through the screen door –
> A. The screen door was propped open.

Bourgeois dep. at 55-56.

The defendant apparently believed at first that the plaintiff was Eichhorn. He stated, "we were screaming Daniel Eichhorn . . . Get out of there. Get down on the ground. Get out of the house." Strawn dep. at 39. According to the defendant, the plaintiff responded "He didn't do it, you've got the wrong guy." *Ibid.* As a result, it took Strawn a few moments to realize that he had

the wrong man.  But Strawn did not inform Fall or Collett, who were still grabbing at the plaintiff.

Instead, the defendant stated "I think what happened was . . . I started yelling, 'Where is . . . Daniel

Eichhorn[.]'" *Ibid.*

The plaintiff testified that he pulled his arm away from the officers who were grabbing at

him.  At that point, the officers "yelled" at  the plaintiff "to come out and lay on the ground." *Ibid.*

The plaintiff stated that Fall, realizing that he was not Eichhorn, ordered the plaintiff back in the

house to fetch Eichhorn.  On this point, however, the defendant and Fall differ in their recollection.

Strawn testified as follows:

> Q.   And you have heard the testimony of Deputy Fall where he directed [the
>      plaintiff] back inside and get Mr.  Eichhorn, correct?
> A.   Yes, I heard that testimony.
> Q.   Today, but you don't recall it then, is that what you are saying?
> A.   No.  I recall then specifically all the officers yelling loudly, giving loud
>      verbal commands, and once realizing that that was not Mr.  Eichhorn, yelling
>      "Get him out here.  Get out here.  Get him out here.  Get out here".  I mean
>      I don't think anyone specifically said, "Mr.  Bourgeois, would you please go
>      in the house and send Daniel Eichhorn out".
> Q.   All right.  You knew now that it wasn't Mr.  Eichhorn.  Why did you still
>      want [the plaintiff] to come out of the house?
> A.   Because Mr.  Eichhorn was still in the house.
> Q.   Okay.
> A.   And it's just potentially once you have someone exit a house you don't have
>      them go back in, I mean, it's –
> Q.   Other than the testimony we've heard and what Deputy Fall – we've heard
>      from Deputy Fall and what he has in his reports about directing Mr. Eichhorn
>      [sic] to go back in . . . – did you sir, at any time ask [the plaintiff] who we
>      now know as Mr. Bourgeois to go inside and get Mr. Eichhorn?
> A.   No.  I was yelling for him to get out of the house and lay down on the
>      ground.

Strawn dep. at 43-44.

The plaintiff went back inside the house, as directed by officer Fall.  The plaintiff stated that

he "told Daniel, I called him Joe, I said Joe, I don't know what is going on here, but look at my kids,

they are all scared and crying, get your ass out the door." Bourgeois dep. at 62.  The plaintiff

continued:

> [Eichhorn] went over there, went outside.  I opened – I stood behind him and I said,
> I'd like to watch this so you guys don't kick the shit out of him.  The way they were
> acting that's what I – I stood there and that was it.  They put him on the ground,
> handcuffed him, and took him out.

*Id.*  at 62-63.

After Eichhorn was taken into custody, the plaintiff testified that defendant Strawn returned

to the house to ask him about a van parked on the property.  At Strawn's request, the plaintiff came

out of his house.  Once outside, the defendant inquired as to some bags that were in the van, and the

plaintiff informed the defendant that the bags belonged to Eichhorn.  The defendant then asked the

plaintiff if he could search the van, and the plaintiff consented.  Payne testified that while the

defendant searched the van, he spoke with the plaintiff and found that the "plaintiff wasn't

threatening in any way, shape or manner," so he did not perform a pat down search for weapons.

Payne dep. at 38.

At this point, the plaintiff states that three more people arrived at the residence: a sergeant

Utt from the DNR, a deputy Robertson from the sheriff's department, and the plaintiff's wife.

Collett explained at his deposition that Robertson had come "up to the scene to investigate Mr.

Bourgeois as a suspect in a breaking and entering complaint of a self-storage unit in Loomis." Pl.'s

Resp. Br. Ex. 6, Collett dep. at 36.  Robertson wanted to interview the plaintiff because "[h]e had

been trying to get a hold of him to conduct an interview for some time." *Ibid.*  Approximately twenty

to thirty minutes after the arrival of Robertson, the plaintiff was arrested by the defendant "for

resisting and obstructing, on the basis that he resisted us during the incident."  Strawn dep. at 51.

Strawn attempted to explain the delay at his deposition:

-8-

Q.      . . . Why did it take you 30 minutes to arrest the guy?  Why did you delay at all?

A.      Because we were conducting an investigation.

Q.      Well, he had already committed the crime.  Why didn't you arrest him?

A.      I didn't see a need or a necessity to take him into custody right then and there.  I still –

Q.      When did you make the decision to take him into custody?

A.      The moment I took him into custody.  Up and to that point I was conducting an investigation.

Q.      Well, as soon as [the plaintiff] had stepped outside the house and you arrested Mr. Eichhorn, had you already made up your mind you were going to arrest [the plaintiff] for R & O?

A.      No.  No.  It was a mental thought process I went through to determine whether or not I thought this crime occurred.

Strawn dep. at 59-60.  The plaintiff was taken to the Clair County Jail by deputy Robertson.

On December 1, 2003, Strawn wrote an incident report in which he stated that the plaintiff had asked Strawn to come into the house to speak with the plaintiff and Eichhorn.  Strawn described the events in his report as follows:

On 11-28-03 I received information that a fugitive was at the residence at 11219 Alpine. . . . Conservation Officer Jeremy Payne, Isabella County Sheriff Deputies Fall and Collet assisted me.

The Officers knocked and announced that we were there to arrest Eichhorn for warrants out of the . . . District court in Isabella County.  We knocked and announced for approximately 30 minutes.  After several minutes, BOURGEOIS peeked out the window and began talking to Deputy Fall.

BOURGEOIS told Deputy Fall that he wanted to talk to a Conservation Officer.  I went to the front of the house to talk to BOURGEOIS.  I asked [him] if EICHHORN was in the house.  BOURGEOIS stated yes.  BOURGEOIS wanted me to come into the house to talk to him and EICHHORN.  I told BOURGEOIS I would meet him at the rear door of the house.

BOURGEOIS exited the rear door of the house and was standing in a covered entryway.  I gave loud verbal directions to BOURGEOIS to exit the entryway and get on the ground.  BOURGEOIS refused to further exit the house.  BOURGEOIS refused to get on the ground.  The Sheriff's deputies attempted to grab BOURGEOIS.  BOURGEOIS resisted them and pulled away from them.  I told BOURGEOIS to exit the house.  [He] refused.  I again asked [the plaintiff] if

-9-

EICHHORN was in the house.  BOURGEOIS stated yes.  BOURGEOIS stated "No one points a gun at me and my house", and went back in the house.

Several minutes later BOURGEOIS came back to the rear door of the house. [He] again stood in the entryway of the house arguing with the officers.  EICHHORN then came out of the rear door of the house.  EICHHORN was taken into custody.  BOURGEOIS was taken into custody.

. . .

<u>VIOLATIONS OF THE ACCUSED</u>

    1.  Felony resist and obstruct police officers.

Pl.'s Resp. Br. Ex. 10, Incident Report (Dec. 1, 2003).

The same day, Strawn signed an "Affidavit in Support of Complaint for Warrant." The affidavit reads:

> On 11-28-03 I received information that Daniel Joseph Eichhorn was at 11219 Alpine Lake MI 48632.  Eichhorn was a fugitive for a larceny incident that occurred in Isabella County.
> . . .
> The above officers responded to the address on Alpine.  The Officers knocked on the door and announced that we [were] there to arrest Eichhorn for the warrants.  After approximately 30 minutes Bourgeois looked out the window and stated Eichhorn was in the residence.  Bourgeois refused to let the officers in the residence.  Bourgeois stated that he would meet the officers at the back door to talk.  Bourgeois came to the back door of the residence.  Bourgeois exited the residence and stood in the back entryway of the residence.  Bourgeois stated that Eichhorn was in the residence.  The officers gave loud verbal commands asking Bourgeois to exit the residence.  Bourgeois refused to exit the residence.  The Deputy officers attempted to take Bourgeois into custody.  Bourgeois pulled away from the Deputies.  Bourgeois went back into the residence.
>
> Ultimately Bourgeois and Eichhorn exited the residence and were taken into custody for the incident.

Pl.'s Resp. Br. Ex. 11, Affidavit for Warrant.  Although the affidavit and the incident report make

no mention of the charge of harboring a fugitive, the uniform law citation stated charges of both

-10-

harboring a fugitive and resisting and obstructing a police officer. The plaintiff was never prosecuted for that offense.

On December 8, 2003, an amended felony complaint was signed. The complaint stated that the plaintiff "did assault, batter, obstruct, oppose, or endanger officer Larn Strawn, a conservation officer of the Michigan Department of Natural Resources that the defendant knew or had reason to know was performing his or her duties; contrary to MCL 750.81d(1)." Def.'s Mot. Summ. J. Ex. G, Amended Felony Complaint.

On December 15, 2003, a preliminary examination was held. A Clare County district court judge found that there was probable cause to hold the plaintiff for trial and denied his motion to dismiss. However, on February 3, 2004, Clare County circuit judge Kurt Hansen quashed the circuit court information. He stated on the record:

> As I've indicated, the basis for the bindover was the finding that the District Court made that the Defendant Bourgeois had not allowed the officers to enter his house to serve the arrest warrant on Eichhorn. In reviewing the transcript (of the preliminary examination) there is no evidence that was presented whatsoever that they asked to go into the house to get Mr. Eichhorn. There's no evidence whatsoever that the police officers themselves even attempted to go inside the house. And there's no evidence whatsoever that the Defendant Bourgeois did anything to stop the police from going inside the house. All the activity that occurred was the police officers attempting to have Mr. Bourgeois leave where the house was so that they could search him for weapons. Thus, its apparent to the Court that the finding of the District Judge that the Defendant did not allow the officers to enter his house so that they could serve a warrant on Mr. Eichhorn, there's simply no evidence to support that conclusion whatsoever. As a consequence, the motion to quash in this situation is quashed. I'll reduce the Defendant's bond to personal recognizance.

Pl.'s Resp. Br. Ex. 12, Transcript of Opinion (Feb. 3, 2004) (grammar irregularities in original).

On February 9, 2004, the Clare County prosecutor sought an order of *nolle prosequi*. The plaintiff was then released from the Clare County Jail, approximately seventy-one days after his arrest.

-11-

On January 24, 2005, the plaintiff filed a two-count complaint in this Court alleging violation of the Fourth Amendment for unlawful arrest under 42 U.S.C. § 1983 (count two) and unlawful arrest and imprisonment under Michigan law (count one) against all of the officers who participated in the incident at his home.   Thereafter, the parties stipulated to the dismissal of all named defendants except Strawn.   After a period of discovery, Strawn filed his motion for summary judgment, which the plaintiff opposes.  In anticipation of trial, the plaintiff filed a motion *in limine* to preclude the defendant from offering evidence at trial of his criminal record, which consists of eight felony and six misdemeanor convictions.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics*

& *Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported.  *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential

element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## A.

To prevail on his section 1983 claim, the plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). The plaintiff alleges in his complaint that his arrest by state officers was illegal because he did nothing wrong. There is no challenge to the proposition that the defendant was acting under color of law. Rather, the defendant contends that the plaintiff cannot prove that his arrest violated the Fourth Amendment because probable cause supported his arrest. He makes this argument in two parts. First, he contends that the plaintiff is bound by the state court's determination at the preliminary examination that there was probable cause to believe he had committed a crime. Next, he says that the facts establish probable cause as a matter of law. Both of these arguments are flawed.

## 1.

It is true that the plaintiff was bound over for trial as a result of the incident at his home. Further, the Full Faith and Credit Act, 28 U.S.C. § 1738, requires that federal courts give state court judgments the same preclusive effect as under state law. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Under Michigan law, "[a] court must apply issue preclusion when 1) the parties in both proceedings are the same or in privity, 2) there was a valid, final judgment in

-14-

the first proceeding, 3) the same issue was actually litigated in the first proceeding, 4) that issue was necessary to the judgment, and 5) the party against whom preclusion is asserted (or its privy) had a full and fair opportunity to litigate the issue." *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004) (citing *Michigan v. Gates*, 434 Mich. 146, 148, 452 N.W.2d 627, 630-31 (1990)).

There is no question that the parties in the present action are not the same as in the sate criminal proceeding: defendant Strawn was not a party to the state case. However, even if he were a party in that case, he cannot benefit from the state district court's finding of probable cause because it was overturned by the circuit court judge when he quashed the information. If there was a "final judgment" in the state court, it was made by the last court to address the matter, not the first. Certainly, defendant Strawn is not bound by the circuit court's holding. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 546 n.4 (6th Cir. 2003) (noting in a civil rights case that the plaintiff "cannot collaterally estop the officers from relitigating this issue because the officers – 'the party against whom estoppel is sought' – did not have 'a full and fair opportunity to litigate the issue' during the suppression hearing") (quoting *Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 515 (6th Cir. 1987)). But neither can Strawn expect to benefit from a lower state court holding that was not sustained by a superior court. The upshot of all this is simply that this Court must independently determine if the arrest was supported by probable cause. *See Knotted v. Sullivan*, 418 F.3d 561, 567-68 (6th Cir. 2005).

### 2.

Turning to the facts of the case, the defendant contends that he had probable cause to arrest the plaintiff at his home on November 28, 2003. He reviews the facts as they now appear to him and argues that on the day of the incident, four uniformed police officers came to the plaintiff's house,

knocked on the door for half an hour with no immediate response, and demanded that the residents open the door.  When the plaintiff finally came to the door, the defendant argues, he refused to speak with a deputy, but then attempted to convince them that the person they wanted to arrest, Eichhorn, was the wrong man.  He says that the plaintiff delayed sending Eichhorn out of the house, refused several commands given by the officers to get out of his house and stop interfering with officers, physically resisted being pulled from his house, acted aggressively by declaring that the police ought not point guns at his house, and retreated into his residence.  Based on that recitation of the facts, the defendant argues that he had probable cause to arrest the plaintiff that day for resisting and obstructing a police officer in the performance of his duties, and being an accessory after the fact to Eichhorn's crimes.

The Court agrees that a reading of the submitted discovery materials may support the defendant's version of the events of the day; but these facts are disputed, and it is the Court's obligation at this stage of the proceedings to view the facts in the light most favorable to the plaintiff.  *Rodgers*, 344 F.3d at 595.  There is evidence in the record that the plaintiff was sleeping and did not hear the knocking; his youngest daughter alerted him to police presence.  The plaintiff also presents evidence that he was ordered out of his home, but then ordered back into his home to get Eichhorn, and he complied with that order.  The defendant's incident report and affidavit for a warrant conflict as to whether the plaintiff invited the police into his home to obtain Eichhorn or whether the police demanded entrance.  There is evidence that it was the plaintiff who persuaded Eichhorn to leave the house and submit to the arrest.  The state circuit judge's gloss on the facts, which of course for the purpose of this motion is just one more person's view of the events, was as follows:

-16-

> In reviewing the transcript (of the preliminary examination) there is no evidence that was presented whatsoever that they asked to go into the house to get Mr. Eichhorn. There's no evidence whatsoever that the police officers themselves even attempted to go inside the house.  And there's no evidence whatsoever that the Defendant Bourgeois did anything to stop the police from going inside the house.  All the activity that occurred was the police officers attempting to have Mr. Bourgeois leave where the house was so that they could search him for weapons.  Thus, its apparent to the Court that the finding of the District Judge that the Defendant did not allow the officers to enter his house so that they could serve a warrant on Mr. Eichhorn, there's simply no evidence to support that conclusion whatsoever.

Pl.'s Resp. Br. Ex. 12, Tr. Opinion (Feb. 3, 2004).

There are two plausible versions of the facts, one that supports the defendant's argument that he had probable cause to arrest the plaintiff for obstruction, and one that supports the plaintiff's version that the defendant had no cause to arrest him.  Summary judgment cannot be predicated on a record where the facts on such material points are in dispute, as here.

The defendant maintains, however, that these facts show probable cause to arrest the plaintiff for obstruction and being an accessory after the fact.  They do not.  In Michigan, any person who does "[a]ssault, batter, wound, obstruct, or endanger a[n] . . . officer or duly authorized person . . . acting in the performance of his or her duties" is guilty of a crime.  Mich. Comp. Laws § 750.479 (2002).  According to the defendant, he had probable cause to believe that the defendant violated this statute when the defendant was ordered out of his house and refused to come out.  He notes that under the present version of the obstruction statute, the attempt to arrest need not be lawful, and the State no longer must prove that it is to make out the elements of that crime.  *See People v. Ventura*, 262 Mich. App. 370, 374-77, 686 N.W.2d 748, 750-52 (2004) (holding that a teenager could not lawfully resist an illegal arrest by an officer for a misdemeanor not committed in his presence).  Therefore, the defendant argues, when the police ordered the plaintiff out of his house, despite the

-17-

lack of a warrant to arrest him or to search the premises, his disobedience amounted to a violation of the state law and gave Strawn probable cause to arrest him.

That argument, that police can manufacture grounds to arrest a person innocent of wrongdoing simple by telling him to leave his own home without any lawful authority to do so and then arresting him for violating that directive, is a disturbing proposition. The Court does not read the Michigan intermediate appellate court's decision in *Ventura* as sanctioning that argument, and the proposition is of questionable constitutional validity. The ancient traditions of our jurisprudence declare that "the house of every one is to him as his castle and fortress," and one's home is safe harbor for the homeowner, "family," and "his own proper goods." *Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B.1604) (quoted in *Minnesota v. Carter*, 525 U.S. 83, 100 (1998)) (Kennedy, J., concurring); *see also Georgia v. Randolph*, 126 S. Ct. 1515, 1523-24 (2006) (observing that "[w]e have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown'") (quoting *Miller v. United States*, 357 U.S. 301, 307 (1958)). Certainly the police could not have entered the home of the plaintiff and removed him without proper judicial authority. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (holding that "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment") (internal quotes, alterations and citations omitted); *Payton v. New York*, 445 U.S. 573, 585 (1980) (declaring that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). The plaintiff's refusal to exit his home on the defendant's order itself amounted to no crime supporting probable cause to arrest.

-18-

Moreover, the facts viewed in the light most favorable to the plaintiff do not support that contention.  Bourgeois actually did exit the house.  He did not do so through the front door, which apparently was covered in plastic.  Instead, he came out the back door and spoke to the police, who had their weapons trained on him.  Then, on the order of officer Fall, he went back in and convinced Eichhorn to come out.

This Court must take care to "assess the existence of probable cause from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citations omitted). However, "determining whether probable cause existed[] presents a jury question, unless there is only one reasonable determination possible." *Ibid.*  Viewed in the light most favorable to the plaintiff, the evidence does not demonstrate that the defendant had probable cause to arrest the plaintiff for resisting or obstructing a police officer.

The defendant also attempts to justify arrest of the plaintiff as an accessory after the fact, which is a common-law felony in Michigan.  The defendant was never prosecuted for this crime, but the defendant can justify his theories of probable cause *post hoc*, since probable cause is an objective standard that focuses not on the officer's state of mind but rather on the objective facts confronting a "reasonable" officer.  "Courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official. 'If the circumstances, viewed objectively, support a finding of probable cause, [then] the arresting officer's actual motives are irrelevant.'" *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005) (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)).

The Michigan Court of Appeals explained the crime in *People v. Mitchell*, as follows:

> Being an accessory after the fact is a common-law felony in Michigan under M.C.L.
> § 750.505; M.S.A. § 28.773. *See People v. Lucas*, 402 Mich. 302, 262 N.W.2d 662
> (1978). An accessory after the fact, at common law, is one who, with knowledge of
> another's guilt, renders assistance to him in the effort to hinder his detection, arrest,
> trial or punishment.

*Mitchell*, 138 Mich. App. 163, 169, 630 N.W.2d 158, 161 (1984).   In this case, there is no evidence

that Strawn knew at the time that the plaintiff was aware that Eichhorn was wanted for or guilty of

the offenses for which Eichhorn was charged.  Strawn testified that the plaintiff

> started taking to me about Mr. Eichhorn's involvement in the case or the indictment
> for the arrest warrants.  He said we had the wrong person, we needed to talk to this
> other individual that was with him, and I basically told him to send Mr. Eichhorn out.
> And he said, no, Daniel will talk to one conservation officer, send a conservation
> officer in.  And, again, I said, no, send Daniel Eichhorn out. We're not going to send
> an officer in.  He said, meet me at the back door, or meet us at the back door.

Strawn dep. at 35.  The plaintiff, however, testified that he had no knowledge of the warrants:

> A.    I came home and my wife asked me, Joe [Eichhorn] didn't have no place to
>       stay . . . . Asked if he could stay there for a few days, that he's not staying at
>       the place he was staying at no more.  And I said yes, but remember this is my
>       kids' house.  You're welcome to stay here until you figure out what you're
>       going to do, and that was it.
> Q.    And what did he tell you about these warrants that were out for him?
> A.    He never said.
> Q.    He never said.
> . . .
> A.    No, he never mentioned it.  He just needed a place to stay, it's cold out, I let
>       him stay there.

Bourgeois dep. at 43-44.

The evidence that the plaintiff "hindered" the defendant's arrest of Eichhorn likewise is

disputed, as noted above.  If the Court accepts the plaintiff's version of events, he did not provide

assistance to Eichhorn in an effort to hinder the police: he did not know that Eichhorn was wanted

and he complied with Fall's order to find Eichhorn and bring him out.  In fact, on each occasion

-20-

when asked, the plaintiff stated that Eichhorn was in his house. Strawn dep. at 35-44. Thus, the defendant did not have a basis to arrest the plaintiff as an accessory after the fact.

The Court concludes that the obvious disputed fact issues preclude judgement for the defendant as a matter of law.

B.

The defendant also raises the defense of qualified immunity. Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Sixth Circuit recently reiterated the requirement announced in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), that this defense must be analyzed in two stages. S*ee Lyon v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005). "When confronted with a claim of qualified immunity, a court must ask first the following question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam) (internal quotes and citation omitted). The second step requires a determination of whether the constitutional violation transgressed a right that was clearly

-21-

established at the time, but "[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 599 (internal quotes and citation omitted).

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004). Ordinarily, these questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). However, when assessing whether the public official's conduct was objectively reasonable, "the legal question of qualified immunity turns upon which version of the facts one accepts, [and] the jury, not the judge, must determine liability." *Champion*, 380 F.3d at 900 (quoting *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000)).

Taken in the light most favorable to the plaintiff, the facts show that the defendant violated his constitutional rights. Courts have interpreted the Fourth Amendment as prohibiting the arrest of an individual without probable cause. *See Beck v. Ohio,* 379 U.S. 89, 91 (1969); *St. John v. Hickey,* 411 F.3d 762, 768 (6th Cir. 2005). Probable cause to arrest exists when "the facts and circumstances within [police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [an arrestee] had committed or was committing an offense." *St. John*, 411 F.3d at 768-69. As noted above, at least one supported version of the facts shows that the defendant arrested the plaintiff absent probable cause. He has proved a violation of the Fourth Amendment.

When a violation of a plaintiff's constitutional right has been established, the court next must determine whether that right was clearly established. The critical inquiry is "whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Solomon*, 389 F.3d at 173 (quoting *Saucier*, 533 U.S. at 202) (internal quotations omitted). The plaintiff need not prove that "the very action in question has previously been held unlawful," but rather "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ibid.*

The Court believes that the plaintiff clearly established his claimed Fourth Amendment violation. As noted above, the undisputed evidence does not show that the defendant had probable cause to arrest the plaintiff during the removal of Eichhorn from the house. He did not have cause to arrest the plaintiff either for obstruction or being an accessory after the fact. There is no evidence that the plaintiff caused a hindrance to the police at the scene requiring that he be subdued during the attempt to arrest Eichhorn; in fact, the plaintiff was not arrested until thirty minutes after Eichhorn was taken away, when Strawn returned and asked to search the plaintiff's van apparently in connection with an unrelated burglary investigation. The plaintiff cooperated in the search, another officer confirmed that the plaintiff did not appear to be a threat and was not frisked for weapons, and the van search presumably did not turn up any incriminating evidence. One might credibly argue that Strawn's decision to arrest the plaintiff for obstructing a police officer was the result of an ill-formed afterthought, which he conjured when he had exhausted all other possible bases for taking him into custody.

When viewing the facts in the light most favorable to the plaintiff, it does not appear that this was a close case or one that lies along the "hazy border," *Saucier*, 533 U.S. at 206, that separated immediate action from reasoned assessment. Rather, the plaintiffs' right to be free from

-23-

unreasonable seizure was clearly established in this case.  Strawn is not entitled to qualified immunity on this record.

C.

The plaintiff has filed a motion *in limine* to exclude evidence of his criminal record at trial. The plaintiff states that he was convicted of eight felonies and six misdemeanors.  The crimes consisted of larcenies, breaking an entering, driving while intoxicated, and a misdemeanor conviction for possession of marijuana.  After the events giving rise to this complaint occurred on November 28, 2003, the plaintiff was convicted of felony possession of stolen property.

The Court finds no basis for the admission of such evidence other than for impeachment. The defendant has not suggested that the evidence is relevant for any other purpose.  Certainly the evidence would tend to prove that the plaintiff had a general bad character, but that is not a proper purpose for the evidence.  *See* Fed. R. Evid. 404(a).  Rule 609 allows prior convictions to be used to impeach a testifying witness, including a plaintiff in a civil case.  However, that rule limits the convictions to felonies and certain misdemeanors that include an element of dishonesty or false statement.  *See* Fed. R. Evid. 609(a)(2).  None of the crimes fall into the latter category.  Therefore, the misdemeanor convictions are not admissible for any proper purpose, and the felonies are admissible if the Court determines that their probative value substantially outweighs their unfairly prejudicial effect.  *See* Fed. R. Evid. 609(a)(1), 403.

The Court believes that probative value and unfair prejudice are best assessed in the context of the trial.  Therefore, the Court will defer ruling on the admissibility of the felony convictions until the presentation of proofs.  The defendant will not be permitted to mention the convictions in his

opening statement, and he may not question the plaintiff about them until he seeks a ruling from the Court at trial out of the presence of the jury.  *See* Fed. R. Evid. 103(c).

III.

The Court finds that fact issues preclude summary judgment for the defendant.  The plaintiff's motion *in limine* will be granted only in part.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 22] is **DENIED**.

It is **ORDERED** that the plaintiff's motion *in limine* [dkt # 25] is **GRANTED IN PART** and the question of the admissibility of the plaintiff's prior felony convictions for the limited purpose of impeachment is deferred to trial.

It is further **ORDERED** that a final pretrial conference is scheduled for **October 4, 2006 at 2:30 p.m.** Trial on the matter is scheduled fro **October 17, 2006 at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 31, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---