UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROLAND J.  BOURGEOIS,

                    Plaintiff,

                                                    Case Number 05-10020
v.                                                  Honorable David M. Lawson

LARN STRAWN,

                    Defendant.
_____/

## OPINION AND ORDER DENYING MOTION FOR NEW TRIAL
## OR FOR JUDGMENT AS A MATTER OF LAW

The plaintiff, Roland J. Bourgeois, filed a complaint seeking damages under 42 U.S.C. §

1983 and state law on the grounds that he had been arrested in violation of the Fourth Amendment

and applicable state law when defendant Larn Strawn, along with the other state law enforcement

officials, executed an arrest warrant on another individual wanted for various livestock crimes.  The

case was tried to a jury, which returned a verdict for the defendant.  Believing that he is entitled to

a judgment of liability as a matter of law and that the verdict is against the great weight of the

evidence, the plaintiff has filed a motion for a new trial or alternatively a judgment as a matter of

law (JMOL).  After carefully considering the parties' briefs and the trial record, the Court must

respectfully disagree with the plaintiff because the jury's verdict was reasonable in light of the

evidence presented, and there is a legally sufficient basis for the jury's verdict.

I.

Defendant Larn Strawn is a conservation officer with the Michigan Department of Natural

Resources ("DNR").  In the fall of 2003, he had procured a warrant to arrest Daniel Joseph Eichhorn

for crimes against livestock.  In searching for Eichhorn, Strawn received a tip from individuals who

stated that Eichhorn was temporarily residing with the plaintiff, Roland J. Bourgeois. The defendant and other officers went to the plaintiff's residence, where they eventually arrested both the plaintiff and Eichhorn. After a state magistrate conducted a preliminary examination, the plaintiff spent seventy-one days in the Clare County, Michigan jail before a state circuit court judge quashed for lack of evidence the criminal information charging resisting and obstructing a police officer. The plaintiff filed suit in this Court on January 24, 2005 alleging unlawful arrest in violation of state law and unlawful arrest in violation of the Fourth Amendment via 28 U.S.C. § 1983.

On November 4, 2005, defendant Strawn filed a motion for summary judgment on the grounds that the plaintiff's arrest was valid and, if not, that the defendant was nonetheless shielded by qualified immunity. Strawn argued that he had probable cause to arrest the plaintiff for either resisting and obstructing a police officer in violation of Michigan Compiled Law section 750.81d or being an accessory after the fact, a common law felony in Michigan. The Court denied the defendant's motion on August 31, 2006.

The plaintiff's case was tried before a jury in this Court from October 17, 2006 through October 20, 2006. The testifying witnesses included the plaintiff, the defendant, officer Jermey Payne, officer Douglas Fall, and officer Scott Collett.

The arrest in this case occurred on November 28, 2003. Defendant Larn Strawn testified that he had made a traffic stop of Daniel Eichhorn in August or September 2003 and issued him a ticket for a traffic violation. Based on this encounter, the defendant stated that he would probably be able to recognize Eichhorn, assuming he did not alter his appearance.

The defendant testified that Eichhorn called him some time later while he was parked outside a local police office in Isabella County. Eichhorn told the defendant that he wanted to talk to a

conservation officer regarding the poaching investigation. The defendant informed Eichhorn that he was not the investigating officer on that case, but he believed there was a warrant outstanding for his arrest, and it would be in his best interest to allow officers to come and talk with him. Eichhorn told the defendant that he could be found at his mother's home, but when the defendant drove to that address along with officer Fall, Eichhorn had left. As the defendant continued on his patrols throughout the ensuing week, he tried to locate Eichhorn, but his attempts were to no avail.

On the morning of November 28, 2003, however, the defendant received a tip from the "McKenzie brothers," whom the defendant had pulled over on a routine traffic stop. Hoping for some leniency on an outstanding misdemeanor warrant, Michael McKenzie told the defendant that he could find out where Eichhorn was. Michael McKenzie called Eichhorn and determined that he was staying at the plaintiff's home at 11219 Alpine Drive in Gray Lake, Michigan. At the time, the defendant and the other officers did not know whose residence that was.

After receiving this tip, the defendant proceeded to the home on Alpine Drive accompanied by officers Payne, Fall, and Collett. Although there was never a formal briefing to develop a plan of action, the officers "all communicated with each other" concerning how the arrest would be effected. Amend. Mot. for New Trial, Ex. 1, Trial Tr. at 14 (Oct. 18, 2006). The defendant testified that neither he nor officer Payne, who also had prior contact with Eichhorn, informed the other officers that they knew what Eichhorn looked like.

When the officers arrived at the plaintiff's residence, they parked on a "side road" and approached the house on foot. The house was small, and the defendant observed a van and a pickup truck in the driveway, although the van did not appear to be regularly used. Officer Fall walked to the front door to make contact, and the defendant stayed nearby in the front yard. According to the

defendant, officer Fall knocked on the front door intermittently for twenty to thirty minutes, while he and the other officers announced their presence, saying things like, "Police. We have an arrest warrant for Daniel Eich[h]orn. We know he is in there. Come out." Trial Tr. at 22, 24, 26, 39 (Oct. 18, 2006).

In the meantime, officer Collett observed someone move a curtain, and the defendant noticed that a barking dog inside the residence had been silenced. Based on these circumstances and the fact that there were two vehicles in the driveway, the defendant surmised that people were home and "were attempting to conceal the fact that they were in the residence." Trial Tr. at 44 (Oct. 18, 2006). The defendant therefore called his supervisor, Sergeant Ronald Utt, for assistance in obtaining a search warrant for the residence. However, the defendant stated that he and the other officers, including Utt, decided that it would be best to give the residents "one last chance" before initiating the lengthy process of obtaining a search warrant. Trial Tr. at 44-45 (Oct. 18, 2006). Accordingly, one of the officers shouted something like, "We're going to go get a search warrant," Trial Tr. at 95 (Oct. 19, 2006), which prompted a young girl, the plaintiff's older daughter, to appear at the front door a few minutes later. The girl told officer Fall that her parents were not home. Officer Fall told the girl to call her parents, but at that moment a man came to the door. The man was the plaintiff, although the officers did not know it at the time.

Fall told the defendant that the plaintiff wanted to speak with a conservation officer. The defendant approached and spoke briefly with the plaintiff at the front door. The defendant identified himself as a conservation officer and told the plaintiff that he and his fellow officers had an arrest warrant for Eichhorn. He asked the plaintiff if Eichhorn was there, and the plaintiff stated that he was. The defendant instructed the plaintiff to send Eichhorn out, but the plaintiff remained

-4-

obstinate: he said that they "had the wrong guy" and should be looking for Eichhorn's cousin. Trial Tr. at 48 (Oct. 18, 2006). According to the defendant, the plaintiff then invited the defendant into the house saying, "Send an officer in. You come in the house." Trial Tr. at 49 (Oct. 18, 2006). The defendant refused and again instructed the plaintiff to come out. At that point, the plaintiff told the defendant to go around to the back door so they could speak more freely because the front door was covered with plastic and had no handle.

The defendant and Fall proceeded to the back door and joined Collett, who had already been waiting there. The defendant and Fall reached the back door contemporaneously with the plaintiff When the plaintiff reached the doorway, all three officers had their guns pointed at him. The defendant and the other officers started yelling at the plaintiff, issuing commands like, "Come out of the house. Come out of the house. Get on the ground. Get on the ground." Trial Tr. at 28 (Oct. 18, 2006). The plaintiff responded, "No one points a fucking gun at me at my house." *Ibid.* One of the officers attempted to grab the plaintiff, but the plaintiff swatted his hands away. The plaintiff then yelled, "I'm not fucking Eichhorn," and retreated back into the home. Trial Tr. at 29 (Oct. 18, 2006). A few moments later, the plaintiff returned with Eichhorn. Officer Fall then identified Eichhorn, handcuffed him, and transported him away from the residence.

The defendant testified that he did not know whether the plaintiff was Eichhorn when he first came to the back door. However, the defendant stated that he realized the plaintiff was not Eichhorn after a few seconds and recognized Eichhorn "as he stepped out." Trial Tr. at 102 (Oct. 19, 2006). According to the defendant, his uncertainty about the identity of the plaintiff was understandable due to the plaintiff's resemblance of Eichhorn. The defendant described the two as "about the same stature, same size, both white males, both had facial hair." Trial Tr. at 100 (Oct. 19, 2006). On the

other hand, the defendant acknowledged that while the plaintiff looked like he was in his thirties or forties, Eichhorn was in his twenties. He also stated that Eichhorn had a full head of hair, while the plaintiff was bald.

The defendant testified that after Eichhorn was arrested, he interviewed the plaintiff about the contents of the van, which he noticed included a plastic bag with a deer antler poking through it. The plaintiff told the defendant that the items in the van were Eichhorn's, and he consented to a search of the vehicle. After the van was searched and several items seized, the defendant arrested the plaintiff for resisting and obstructing police officers in the performance of their duties. The defendant stated that the arrest occurred after he had a discussion with Sergeant Utt, who arrived on the scene pursuant to the defendant's radio request.

Upon the plaintiff's arrival at the Clare County Jail, a state trooper called the defendant to determine the charges upon which the plaintiff was being held. Per the defendant's instructions, the trooper "authored a citation for resisting and obstructing and for harboring a fugitive." Trial Tr. at 69 (Oct. 18, 2006). The defendant testified that he did not arrest the plaintiff for harboring a fugitive, but he also stated that probable cause to arrest on that charge was developed through his and the other officers' observations at the scene. Therefore, the harboring a fugitive offense, although not the subjective basis for the original arrest, appeared on paper following the state trooper's call.

The plaintiff's testimony was in many respects consistent with that of the defendant. He stated that on the day of the incident he was in his home with his two daughters and son, along with two other minor girls who were friends of the plaintiff's older daughter. Eichhorn, who is the plaintiff's wife's cousin, was also in the home and was residing there on a temporary basis. The

plaintiff testified that Eichhorn showed up at the home two or three days prior to November 27, 2003, Thanksgiving Day. Eichhorn, along with the plaintiff's wife, asked the plaintiff if he could stay there for a few days because he did not have any other place to go. The plaintiff stated that he did not really want the company because the house was small, but he agreed to allow Eichhorn to stay with the warning that the space was the home of his children, and Eichhorn should act accordingly.

As to the condition of the house, the plaintiff confirmed that the windows and front door were covered on both sides with plastic sheeting. In addition, the plaintiff stated that the front door was not useable as a point of entrance because it had no handle and his wife had secured the door with a deadbolt. The plaintiff testified that the back door opened onto a small porch. The porch measured four feet by eight feet, was made of plywood, and had a roof. It also had a screen door, but that door was propped open at all times to allow the dog to take shelter from the elements.

The plaintiff testified that he and the rest of the individuals in the house stayed up late on the night of November 27, 2003. They were watching TV and playing video games, and the plaintiff did not get to bed until 1:30 or 2:00 a.m. The plaintiff's wife left at 4:00 a.m. on the morning of November 28, 2003 to go babysit for her brother while he and his family went to the "After-Thanksgiving Day Sale" at Wal-Mart.

The plaintiff testified that he was sleeping in the upstairs bedroom when the officers arrived on the scene. According to the plaintiff, he did not wake up until his younger daughter came upstairs, roused him, and said, "Dad, the police are here, they are pointing guns at our house." Trial Tr. at 142 (Oct. 19, 2006). It was not until then that he heard the officers' knocks and shouts. The plaintiff accounted for this discrepancy through his testimony that he had a severe hearing problem

in his right ear and he was sleeping on his left ear at the time. Upon awakening, the plaintiff looked out the upstairs window and saw an officer walking up the driveway with a gun in his hand. At the same time, he heard his older daughter say to someone outside, "My parents aren't home." Trial Tr. at 144 (Oct. 19, 2006). The plaintiff immediately went downstairs, told his daughter, "I'm here," and walked to the front door where his daughter had been talking to one of the officers. *Ibid.* The officers told him to "open up." Trial Tr. at 145 (Oct. 19, 2006). He told the officers to go around to the back and motioned in that direction with his arm. The plaintiff then proceeded to the back door. He claimed that the officers did not say anything at the time about Daniel Eichhorn or having a warrant for his arrest.

Upon opening the back door, the plaintiff was met by the defendant and the other officers. They had their guns trained on him and yelled, "Get out here and lay on the ground." Trial Tr. at 147 (Oct. 19, 2006). The plaintiff stated that one of the officers tried to grab him, but the plaintiff pulled his arm back. The plaintiff then heard one of the officers say that they had a warrant for Daniel Eichhorn. The officer asked if Eichhorn was in the house, and the plaintiff responded in the affirmative and asked, "Does someone want to come in and talk to him?" Trial Tr. at 148 (Oct. 19, 2006). Instead of accepting his invitation, the officers inquired who the plaintiff was. The plaintiff said he was Roland Bourgeois and he owned the house. He asked the officers what they were doing there; they again said they were looking for Daniel Eichhorn and commanded the plaintiff to exit the house and get on the ground. The plaintiff admitted he then made profane comments regarding the pointing of guns at his home. One of the officers again asked if Eichhorn was in the home and, after the plaintiff responded that he was, ordered the plaintiff to "[g]o in and get him." Trial Tr. at 150 (Oct. 19, 2006).

The plaintiff then closed the door, went back inside the home, and confronted Eichhorn. The plaintiff said to him, "I don't know what you done, but you got to go deal with this. You get your ass out of my house. Look at my kids, crying and screaming." Trial Tr. at 151 (Oct. 19, 2006). Eichhorn complied, with the plaintiff escorting him to the back door. The plaintiff estimates that thirty seconds elapsed from the moment he left the officers at the door to the moment he returned with Eichhorn. As soon as Eichhorn walked out of the door, the officers took Eichhorn to the ground and handcuffed him.

Following this scene, the plaintiff closed the door and went back inside the house. He watched the officers, who were still wandering around the yard, through the front window. Five minutes later, one of the officers (the plaintiff could not say which) knocked on the back door and asked the plaintiff if he was the owner of the van. The officer told the plaintiff he had some questions regarding the van, and the plaintiff accompanied him outside. The officer questioned the plaintiff about a black trash bag full of items that was located in the rear of the vehicle. The plaintiff informed the officer that the bag was Eichhorn's and he did not know what it contained. The plaintiff consented to a search of the van and went back inside the home to fetch the keys and a coat. Throughout this series of events, the plaintiff was never frisked or otherwise checked for concealed weapons. The officers found a set of deer horns mounted on a plaque, and the plaintiff told them they could take it.

After the officers searched around the premises for some other items belonging to Eichhorn, Isabella County Sheriff's Deputy Robertson approached the plaintiff and questioned him about an unrelated criminal investigation. After this conversation, the plaintiff stated that he noticed another conservation officer (sergeant Utt) arrive on the scene in his patrol car. The plaintiff testified that

the defendant spoke with Utt for a while and then placed the plaintiff in handcuffs and told him he was under arrest for resisting and obstructing. The plaintiff was taken to the Clare County Jail, where he remained imprisoned for seventy-one days.

At the beginning of trial, it became apparent that the defendant planned on defending the case in large part on the theory that the order given to the plaintiff to exit his home was lawful or, if unlawful, that the plaintiff nevertheless had the obligation to comply with it. Although the Court in its summary judgment ruling previously had foreclosed the defendant from advancing this latter argument with respect to whether probable cause existed, *Bourgeois v. Strawn*, 452 F. Supp. 2d 696, 709-10 (E.D. Mich. 2006), the theory was still potentially viable in terms of qualified immunity. The Court directed the parties to submit supplemental briefs on the matter to assist in drafting an appropriate jury instruction. Relying on *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), the Court instructed the jury on that point as follows:

> A law enforcement officer may take reasonable measures for the protection of his own safety when serving an arrest warrant. However, the refusal of an individual, lawfully in his home, to exit his home on the order of a law enforcement officer does not itself amount to a crime because police officers have no right to force a person out his home with their guns drawn to conduct an interview.

Jury Inst. at 29.

The Court also explained to the jury that the plaintiff's was that the defendant should be held liable under 42 U.S.C. § 1983 for arresting the plaintiff in violation of the Fourth Amendment. The instructions provided the definition of probable cause and the basic elements of a claim section 1983. Likewise, the instructions set forth the defendant's position that probable cause existed to believe the plaintiff had either resisted and obstructed a police officer in violation of Michigan Compiled Law § 570.81d or harbored a fugitive in violation of Michigan Compiled Law § 750.199.

-10-

On October 20, 2006, the jury returned a verdict for the defendant finding no liability.

The plaintiff filed his original motion for new trial on October 29, 2006. The Court ordered the parties to furnish relevant parts of the trial transcript, and the plaintiff filed an amended motion for new trial on April 20, 2007, which included as an exhibit a large portion of the trial transcript.

## II.

In his present motion, the plaintiff seeks relief under Rules 50 and 59 of the Federal Rules of Civil Procedure. Rule 50(a) provides that a motion for judgment as a matter of law, formerly known as a motion for a directed verdict, "may be made at any time before the case is submitted to the jury" and may be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1), (2). If the court denies a motion for judgment as a matter of law, "[t]he movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment." Fed. R. Civ. P. 50(b). "It is well-settled that a court can only consider a motion for a judgment notwithstanding the verdict *only if* the moving party has previously made a motion for a directed verdict at the close of all the evidence." *Portage II v. Bryant Petrol. Corp.*, 899 F.2d 1514, 1522 (6th Cir. 1990).

In this case, the plaintiff did not file a motion for judgment as a matter of law under Rule 50(a) before the case was submitted to the jury. Therefore, the Court may not entertain a motion based on that rule after the trial is over. To the extent that the plaintiff seeks relief in the form of a judgment as a matter of law under Rule 50(b), the motion must be denied.

The main thrust of the motion, however, is that the verdict is against the great weight of the evidence and therefore the plaintiff is entitled to a new trial under Rule 59. The plaintiff does not

contend that the defendant committed any impropriety during trial or that evidence was admitted improperly. Rather, he argues that the evidence overwhelmingly showed that he was arrested illegally because the defendant did not have probable cause to take him into custody. The plaintiff proceeded on the theory that he was first seized within the meaning of the Fourth Amendment when he was told that he was under arrest and placed in handcuffs, which occurred outside the plaintiff's home after the confrontation involving Daniel Eichhorn had subsided. His basic theory, therefore, was that his arrest was unconstitutional not because it failed to comply with the warrant requirement, but because the defendant did not have probable cause to believe the plaintiff had committed a crime.

Federal Rule of Civil Procedure 59 provides that in an action tried before a jury, a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). Although Rule 59 does not specifically enumerate the grounds upon which a motion for new trial may be granted, the Supreme Court has stated that a "motion for new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). In addition, a motion for new trial "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Ibid.* "The absence of specific grounds should not obscure the governing principle. The court has the power and duty to order a new trial whenever, it its judgment, this action is required in order to prevent injustice." Wright, Miller & Kane, Federal Practice and Procedure § 2805.

Although the grant or denial of a motion for new trial lies within this Court's broad discretion, *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)), when the motion is based on a claim that the jury misapplied the properly-admitted evidence, closer scrutiny generally is required. In *Duncan v. Duncan*, 377 F.2d 49 (6th Cir. 1967), the court of appeals cautioned:

> Where no undesirable or pernicious element had occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

*Id.* at 54 (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960) (en banc)).

That warning was reaffirmed recently in *Denhof v. City of Grand Rapids*, __ F.3d __, 2007 WL 627819 (6th Cir. Feb. 28, 2007). In that case, the court of appeals outlined the standard that should apply to motions for new trial based on an against-the-great-weight-of-evidence theory:

> In considering a motion for a new trial on the ground that the verdict is against the weight of the evidence, the court is not to set aside the verdict simply because it believes that another outcome is more justified. . . . The court is to accept the jury's verdict if it is one which reasonably could have been reached. . . . To put it more succinctly, this court will overturn a grant of a motion for a new trial on the basis that the verdict was against the weight of the evidence where it is clear that the jury verdict was reasonable.

*Id.* at *9 (Citations and internal quotes omitted).

In this case, the defendant argued before trial that he had probable cause to arrest the plaintiff for resisting and obstructing a police officer in the performance of his duty, Mich. Comp. Laws §

750.81d, and being an accessory after the fact, Mich. Comp. Laws § 750.505 (defining common law crimes), both violations of Michigan law. However, the defendant refined his position at trial; rather than advocating that probable cause existed to arrest for accessory after the fact, he contended instead that probable cause existed to believe the plaintiff harbored a fugitive in violation of Michigan Compiled Law § 750.199. The instructions given to the jury reflected this subtle change. *See* Jury Instr. at 25-26.

The evidence does not support the claim that the defendant actually believed he had probable cause to arrest the defendant at the scene for the accessory or harboring crimes at the time he took Mr. Bourgeois into custody. In deciding the motion for summary judgment, however, the Court held that the defendant's actual state of mind did not restrict his available defenses:

> The defendant also attempts to justify arrest of the plaintiff as an accessory after the fact, which is a common-law felony in Michigan. The defendant was never prosecuted for this crime, but the defendant can justify his theories of probable cause *post hoc*, since probable cause is an objective standard that focuses not on the officer's state of mind but rather on the objective facts confronting a "reasonable" officer. "Courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official. 'If the circumstances, viewed objectively, support a finding of probable cause, [then] the arresting officer's actual motives are irrelevant'" *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005) (quoting *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988)).

*Bourgeois v. Strawn*, 452 F. Supp. 2d 696, 710-11 (E.D. Mich. 2006). Therefore, if there is evidence in the record from which the jury could reasonably find that a reasonable officer in defendant Strawn's position could have had probable cause to believe that the plaintiff committed one of the three crimes discussed above, that is, resisting and obstructing a police officer, being an accessory after the fact, or harboring a fugitive, the Court must respect the jury's verdict and deny the plaintiff's motion for new trial.

The Court does not believe that the evidence supports a finding that the plaintiff resisted or

obstructed a police officer in the performance of his duties. The state statute, Michigan Compiled

Law § 750.81d(1), defines the crime as follows:

> Except as provided in subsections (2), (3), and (4), an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

The Michigan Court of Appeals has clarified that this section applies even if the order given or the

performance of the officers' duties is not lawful. In other words, a person in Michigan may not

resist an unlawful order. *See People v. Ventura*, 262 Mich. App. 370, 373, 686 N.W.2d 748 (2004)

(holding that minor defendant could be prosecuted for resisting and obstructing under Mich. Comp.

Law § 750.81d although the arrest he resisted was unlawful). And that is the peg on which the

defendant hung his claim, arguing that the plaintiff violated that statute when Strawn ordered him

to leave his home and the plaintiff refused, even though Strawn had no constitutional authority to

order the plaintiff out of his own house. But this Court firmly rejected that interpretation of the

statute when deciding the summary judgment motion, stating:

> That argument, that police can manufacture grounds to arrest a person innocent of wrongdoing simple by telling him to leave his own home without any lawful authority to do so and then arresting him for violating that directive, is a disturbing proposition. The Court does not read the Michigan intermediate appellate court's decision in *Ventura* as sanctioning that argument, and the proposition is of questionable constitutional validity. The ancient traditions of our jurisprudence declare that "the house of every one is to him as his castle and fortress," and one's home is safe harbor for the homeowner, "family," and "his own proper goods." *Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B. 1604) (quoted in *Minnesota v. Carter*, 525 U.S. 83, 100 (1998)) (Kennedy, J., concurring); *see also Georgia v. Randolph*, --- U.S. ----, 126 S.Ct. 1515, 1523-24 (2006) (observing that "[w]e have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown'") (quoting *Miller v. United States*, 357

U.S. 301, 307 (1958)). Certainly the police could not have entered the home of the plaintiff and removed him without proper judicial authority. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (holding that "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment") (internal quotes, alterations and citations omitted); *Payton v. New York*, 445 U.S. 573, 585 (1980) (declaring that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). The plaintiff's refusal to exit his home on the defendant's order itself amounted to no crime supporting probable cause to arrest.

*Bourgeois*, 452 F. Supp. 2d at 710. As a matter of law, therefore, the plaintiff could not have violated the statute by refusing to come out of his house.

Moreover, the mass of evidence suggests that the plaintiff was basically cooperative. The testimony establishes that as soon as the plaintiff became aware of the officers' presence, he spoke with them at the front door. He directed them towards the back door because the front door was not usable as a point of entrance, being covered with Visqueen and missing a handle. He met the officers at the back door prepared to speak with them, even if he was not ecstatic over their presence. The fact that the plaintiff may have expressed his opinion to the officers that they should be looking for Eichhorn's cousin rather than Eichhorn himself does not amount to resisting and obstructing in violation of section 750.81d. Merely to voice one's objection to an officer's belief as to who is the guilty party does not amount to a proscribed act under the statute, and the defendant has not pointed to any authority that construes the statute so broadly. The jury could not have reasonably based its verdict on a finding that the defendant had probable cause to arrest the plaintiff for resisting and obstructing a police officer.

The defendant did not pursue the claim that he had probable cause to arrest the plaintiff for being an accessory after the fact, and the Court did not instruct the jury on that crime. There is no

basis in the record for the jury to conclude that the defendant had probable cause to arrest the plaintiff for that crime.

The existence of probable cause to arrest for harboring a fugitive presents a closer call. The statute states that "[a] person who knowingly or wilfully conceals or harbors for the purpose of concealment from a peace officer a person who is the subject of" an arrest warrant for a misdemeanor is guilty of a misdemeanor, and if the fugitive is the subject of a felony warrant, the harboring crime becomes a felony. Mich. Comp. Law § 750.199(2), (3). The Michigan Court of Appeals has explained that this statute does not preempt the common law felony of being an accessory after the fact; it "merely prohibits the providing of a refuge for or hiding the escapee" or individual subject to an arrest warrant. *People v. Crousore*, 159 Mich. App. 304, 312, 406 N.W.2d 280, 283 (1987). Other acts taken to prevent a prohibited person's arrest or detection, such as "providing supplies, weapons, money or transportation," remain punishable as accessory after the fact. *Ibid.*

The defendant testified that Officer Fall knocked intermittently on the front door for twenty to thirty minutes while the defendant and the other officers loudly said things like, "Police. We have an arrest warrant for Daniel Eichhorn. We know he is in there. Come out." Trial Tr. at 39 (Oct. 18, 2006). The defendant also testified that when he encountered the plaintiff at the front door, the plaintiff told him and his fellow officers they were looking for "the wrong guy":

> I came to the door area where Officer Fall was talking to this individual. I again identified myself as a police officer and told him that we had an arrest warrant for Daniel Eichhorn and that we – I asked if he was in there. The gentleman told me yes. I told the gentleman to send him out. The gentleman told me we had the wrong guy. We were – we should be looking for someone else, that Daniel Eicchorn wasn't the guy or it was his cousin.

Trial Tr. at 48 (Oct. 18, 2006). Based on this testimony, a jury could reasonably infer that the plaintiff had advance knowledge that Eichhorn was the subject of an arrest warrant and that the plaintiff allowed Eichhorn to stay with him to evade detection. Although the plaintiff denied that Eichhorn had told him there was a warrant for his arrest, and also denied that he had ever told the police officers they were looking for the wrong guy, there was no evidence to corroborate these assertions. The jury has the authority to weigh the credibility of the witnesses and choose the version of conflicting testimony it will rely upon. Even though the defendant did not base his arrest of the plaintiff at the time on the crime of harboring a fugitive, there was evidence in the record that a reasonable officer in his position could have had probable cause to believe that crime was committed in his presence, and an arrest based on that knowledge would satisfy the Fourth Amendment.

There was abundant evidence in this case that would have supported a verdict for the plaintiff. The testimony showed that the conservation officers were poorly organized, approached the plaintiff's house without a proper plan, behaved in a way that could have escalated a routine arrest for a minor offense into a life-threatening incident, and then arrested the plaintiff after all of the confusion had subsided when an appearance ticket would have sufficed. However, there is evidence in the record upon which the jury could have found that all this bungling nonetheless did not violate Roland Bourgeois's constitutional rights. As noted above, "the court is not to set aside the verdict simply because it believes that another outcome is more justified," *Denhof v. City of Grand Rapids*, 2007 WL 627819 at *9, and when the jury's verdict reasonably is based on the record evidence, that verdict must stand.

## III.

The plaintiff may not pursue a motion for a JMOL under Rule 50(b) because he did not seek

such relief at trial. There is evidence in the record establishing that the jury's verdict is reasonable,

and therefore the plaintiff is not entitled to a new trial under Rule 59 on the ground that the verdict

is against the great weight of the evidence.

Accordingly, it is **ORDERED** that the plaintiff's motion and amended motion for judgment

as a matter of law or for a new trial [dkt #s 40, 50] are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 7, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 7, 2007.

s/Felicia M. Moses
FELICIA M. MOSES